# UNITED STATES DISTRICT COURT
## District of Kansas
(Wichita Docket)

UNITED STATES OF AMERICA,

       Plaintiff,

    v.                          CASE NO.  24-cr-10096-01-EFM

MARIO GUERRERO, JR.,

## UNITED STATES' ANTICIPATED
## EXPERT WITNESS DISCLOSURE

The United States, by and through undersigned counsel, provides the following notice of expert testimony, pursuant to Federal Rules of Criminal Procedure 16(a)(1)(E) and (G) and Fed. R. Evid. 702, 703, and 705, which the government intends to present in its case-in-chief at trial. The United States respectfully reserves the right to offer additional testimony by these experts, or other expert witness(es), and for the experts to amend or adjust their opinion and bases for those opinions due to information made known to the experts before or during trial.

Notwithstanding the foregoing, the United States respectfully reserves its right to supplement this Notice with any additional expert witnesses that, although unknown and hence unidentified at this time, may later become essential to its case in chief if and when additional facts not presently known come to light.

The United States requests full disclosure of all information required pursuant to Federal Rules of Criminal Procedure 16(b) no later than ten days from the filing of this notice.

## Expert Witnesses

1. **Drug Expert- Special Agent Erik Brown with the Drug Enforcement Administration (DEA)**

   a.     **Opinion:** It is anticipated that SA Brown will testify regarding the common practices of drug trafficking organizations, drawing parallels and distinctions to the present case. These practices will include, but are not limited to, the identifying of slang words for the narcotics and other aspects of the drug trade, the placing of properties, vehicles and other assets in the names of others, the use of couriers and transporting controlled substances across various borders. He will provide information on what quantities are considered distribution versus personal use quantities and what indicators there are of distribution versus personal use. A report from SA Brown containing his expected testimony is attached hereto.

   b.     **Basis and Reasons for the Opinion:** SA Brown's opinions have been formulated from a combination of the officer's professional experience, training, first-hand knowledge, contact with members of the narcotics trade in Kansas, participation in the underlying investigation, contact with members of the investigatory team, reports from the present case investigation, observations during the course of his career, and additional reference materials.

c.    **Qualifications:**  The Curriculum Vitae of SA Brown is attached hereto. He has no relevant publications.

d.    **Prior Expert Testimony:**  SA Brown has not provided expert testimony in the past four (4) years.

I, Erik Brown, have read and approved this disclosure.

ERIK BROWN
Digitally signed by ERIK BROWN
Date: 2024.11.04 11:28:17 -06'00'

_____
ERIK BROWN
Special Agent
DEA

2.    **Cynthia Wood-Forensic Scientist**

The United States intends to call Cynthia Wood, Forensic Scientist with the Kansas Bureau of Investigations, Forensic Laboratory as an expert witness at trial regarding the testing of controlled substances. Ms. Wood will testify regarding the substances at issues in this this case, and opine, that through testing including weight determination; spot testing; ultraviolet/visible spectrophotometry and gas chromatography-mass spectrometry examination, the substances at issue contained methamphetamine and fentanyl.

a.    **Opinion:**  Ms. Wood will testify to receiving and testing items 1 through 4 as laid out in her lab report, Case # G24-01552, which was previously provided to the parties through discovery and is attached to this disclosure and incorporated herein. Item 1 contained six (6) bundles of white powder with five of those bundles being tested. Item 2 contained two (2) bundles of white powder. Item 3 contained ten (10) bundles of crystals. Item 4 contained two (2) bags of round pills. This report contains Ms. Wood's opinions as

to the identification of the substances in each item. Specifically, Ms. Wood will testify that fentanyl was detected in Items 1, 2 and 4 and methamphetamine was detected in Item 3. The lab report indicates the total net weights of all of the substances tested.

      **b.**    **Basis and Reasons for the Opinion:**  Ms. Wood's opinions have been formulated from a combination of her professional experience and training. Ms. Wood examined the substances provided and tested those substances in accordance with Kansas Bureau of Investigations, Forensic Laboratory and industry and protocols and procedures which utilize a variety of tests, such as weight determination; spot testing; ultraviolet/visible spectrophotometry and gas chromatography-mass spectrometry examination. Ms. Wood's expert report, previously provided to the parties through discovery and attached to this disclosure and incorporated herein also contains the basis for her opinions. Each report is signed by Ms. Wood and contains "all the opinions and the bases and reasons for them required by [Fed.R.Crim.P. 16(a)(1)(G)] (iii)." As such, the government asserts that Ms. Wood is not required to sign this notice pursuant to Fed.R.Crim.P. 16(a)(1)(G)(v).

      **c.**    **Qualifications/ Previous Publications:**  Ms. Wood's qualifications are listed out in her curriculum vitae which was previous provided to the parties in discovery and attached to this disclosure and incorporated herein. Publications are listed on Ms. Wood's curriculum vitae.

      **d.**    **Prior Expert Testimony:**  Ms. Wood's prior expert testimony information is attached to this disclosure and incorporated herein.

Notwithstanding the foregoing, the United States reserves its right to supplement this *Notice* with any additional expert witnesses that, although unknown and hence unidentified at this time, may later become essential to its case in chief if and when additional facts not presently known come to light.

Respectfully submitted,

KATE BRUBACHER
United States Attorney

s/ Katherine J. Andrusak
KATHERINE J. ANDRUSAK
Assistant U.S. Attorney
1200 Epic Center, 301 N. Main
Wichita, Kansas 67202
Telephone: (316) 269-6481
Fax: (316) 269-6484
K.S.Ct.No. 25961
E-mail: katie.andrusak@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

s/ Katherine J. Andrusak
KATHERINE J. ANDRUSAK,
Assistant U.S. Attorney

## Qualifications and Expected Testimony of

## Drug Enforcement Administration (DEA)

## Special Agent Erik Brown

1. I am an investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510 (7); that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2. I am a Special Agent with the Drug Enforcement Administration (DEA) and have been so employed since February, 2009. I was assigned to the DEA Garden City, Kansas Resident Office from March, 2009 through December, 2016. I was assigned to the DEA Fort Worth, Texas District Office from December, 2016 through October, 2019. I was then assigned to the DEA Garden City, Kansas Post of Duty on October, 2019 where I am currently assigned.  I attended the DEA Training Academy at Quantico, Virginia from September, 2008 to February, 2009, where I received specialized training in narcotics and money laundering investigations. I have since received training in complex conspiracy investigations, telecommunications exploitation and asset forfeiture. Prior to joining the DEA, I was a police officer with the Arlington, Texas Police Department for over six years. I also have an undergraduate degree in Finance/Economics.

3. During my tenure in law enforcement, I have participated in hundreds of investigations into the transportation, possession, manufacture, and distribution of controlled substances, as well as the laundering of drug proceeds, and the associated conspiracies. These investigations have involved local, regional, national, and international criminal groups. Many of these investigations have resulted in the arrest and conviction of several

defendants for state and federal drug trafficking violations. During these investigations I have employed a variety of investigative techniques to include conducting surveillance, buying drugs using undercover law enforcement officers and confidential sources, authoring and executing search warrants for physical locations and electronic devices, conducting searches of premises and vehicles, and interviewing confidential sources, cooperating defendants, and other law enforcement officers that have personal knowledge of drug and money laundering activities.

4.  I also have training and personal experience in the authorized interception and monitoring of wire and electronic communications related to drug trafficking. As such, I have become familiar with the many methods and modes drug traffickers use to communicate about their illegal activities to include the use of cellular telephones with voice and text capabilities. For instance, cellular telephones are frequently used by drug traffickers to verbally and textually communicate various types of information with organization members, such as: (a) telephone numbers of co-conspirators; (b) the identities of co-conspirators involved in the drug trafficking enterprise; (c) locations of meetings with co-conspirators; (d) prices and quantities of controlled substances; (e) financial account numbers and other business information related to money laundering and (e) alerts or warnings of the presence of law enforcement.

5.  Due to my education, training, and extensive experience, I have testified in federal court as an expert witness, provided formal and informal training to other narcotics officers, been assigned to train new DEA personnel, and been an acting DEA supervisor which has included approving written reports and monitoring field activities and enforcement operations.

6.  Through my training and experience I am aware that drug traffickers and money launderers frequently attempt to stymie the investigative efforts of law enforcement.

Specifically, drug traffickers and money launderers often utilize hidden compartments in vehicles, utilize concealments for drugs, use counter surveillance, and utilize fictitious names or the names of others when obtaining telephone service, registering vehicles, and completing financial transactions. Drug traffickers and money launderers also often change telephones/telephone numbers on a regular basis, change transportation routes utilized by couriers, change vehicles and residences regularly, establish false businesses to act as a cover for their illegal activity, and use terminology and coded language regarding drug trafficking and money laundering activities that is intended to disguise the true nature of their communications.

7.  I am aware that individual criminal organizations typically utilize terminology and coded language that is specific to their organization. I have also learned that traffickers don't always utilize the same terminology and coded language with all of the members of their organization. In deciphering coded language, I utilize my training and experience in conjunction with the context of the communication, and the context of the investigation. Through my training and experience I am aware of the standard units of measure for various types of drugs, and the prices for those drug units in various areas of the country. I have also learned through my training and experience that frequently there is a series of telephone calls between traffickers when speaking about a drug transaction utilizing coded language. It has been my experience that often the code words do not fit the context of the conversation. Coded words often describe the type, quantity, and/or quality of a specific drug. In addition, various coded terminology is used to describe other facets of the illicit business such as currency and firearms.

8.  I am aware that the technology being employed by criminal organizations is ever changing and evolving to circumvent detection by law enforcement agencies throughout the world. Criminal organizations not only routinely change telephone numbers,

intentionally fabricate subscriber information, or utilize prepaid cellular telephones where minimal information is required, but they also routinely employ the use of various encrypted communication applications to include WhatsApp, Signal, and other encrypted communication applications. These applications prove extremely difficult, if not impossible in some cases, for law enforcement to monitor, track, and or counter during criminal investigations. In addition, these organizations also communicate via instant messaging through various social media applications such as Facebook Messenger. Often couriers and other members of drug trafficking organizations will utilize multiple cellular telephones. These individuals will often possess one telephone that they utilize for non-nefarious activities and another cellular telephone specifically for use in drug trafficking. In many instances, these individuals may possess multiple cellular telephones specifically for drug trafficking activities as it allows the user to either switch back and forth between phones to thwart any tracking methods law enforcement may employ. Having multiple telephones also gives individuals the ability to completely switch to another phone and no longer utilize the previous phone. Sometimes this is because of a perceived law enforcement presence, an arrest of a co-conspirator, or the interdiction of the illicit activity in which they are participating. On some occasions, couriers will purchase a pre-paid cellular telephone with no authentic subscriber information associated to the account in order to correspond specifically for that drug trafficking activity or any other criminal activities.

9.  I am aware that individuals within organizations are typically allowed certain access to other individuals involved in the organization. This is typically due to the intentional compartmentalization that organizations employ to insulate high ranking members from law enforcement detection. Often prospective purchasers of drugs and/or associates who wish to purchase larger quantities of drugs must utilize another member with access to a

source of supply to obtain a larger quantity of drugs. Individuals involved in the organization often require that new or prospective customers be vetted by another member of the organization prior to conducting a future transaction. Criminal associates engaged in a drug conspiracy also may have differing access to prospective customers. For example, if one co-conspirator has drugs on hand to distribute, but has no prospective buyers, he/she may seek the assistance of the co-conspirator if that individual has access to prospective customers. There is a mutual benefit to both criminal associates which allows the enterprise to continue.

10. Based on my training and experience in conducting drug investigations, making arrests of drug traffickers, executing search warrants of drug traffickers' dwellings and conveyances, and conducting interviews of drug traffickers, I am aware that drug traffickers often possess weapons, typically firearms, on their persons or in close proximity as a means to protect themselves and their illicit trade. Drug traffickers typically refer to their distribution of illicit narcotics as a "business". This criminal enterprise relies on a product (illicit narcotic) which is in high demand and has a large profit margin. The drug trafficker often is utilizing U.S. Currency to purchase illicit narcotics to then distribute the narcotics in a manner which allows the trafficker to make a substantial profit. During the whole endeavor, every portion of the drug trafficking enterprise is under threat of not only law enforcement, but other criminal organizations. Unlike legitimate businesses, drug traffickers cannot purchase insurance or report "losses" of product to law enforcement. Therefore, drug traffickers often utilize firearms to protect themselves and their business from theft, robbery, and loss as this directly effects the profit margin. Due to the value of the drugs, drug traffickers often fear robbery or theft and thus utilize firearms to protect their drugs in order to continue operating their illicit business. In some cases, traffickers are provided drugs to sell from a source of

5

supply without having paid for the drugs in advance. This is referred to as "fronting". Drug traffickers who owe money to a source of supply are reliant on distributing those drugs in order to not only make a profit, but to pay back the source from which they received the drugs. Failure to do so can place themselves not only in jeopardy of not being provided drugs to distribute in the future, but physical harm from the source of the drugs. Due to many drug traffickers and other individuals engaged in criminal activity having a criminal history which would preclude them from owning a firearm legally, many purchase firearms illicitly through other criminal associates and organizations to remain undetected by law enforcement. These firearms are typically acquired through other criminal activities such as robbery, residential and commercial burglary, theft, and by legitimate purchasers who in turn knowingly or unknowingly sell the firearm to an individual who is legally not allowed to own the firearm. In addition, firearms are often trafficked as piece of property utilized to trade for a quantity of drugs. Traffickers who may be ineligible to purchase a firearm legitimately may utilize a drug transaction to acquire a firearm by trading a quantity of drugs for the firearm(s).

11. Based upon my training, experience, communications with other law enforcement personnel, and interviews of numerous drug offenders, I am aware that the price of drugs in one area of the country may differ from the price of the same quantity of drugs in another area of the country. As most illicit drugs originate in Latin America and Asia, the areas of the United States that are closest to Latin America and Asia, such as South Florida, the Southwest Border of the United States, and California typically have lower drug prices. Additional costs to the organization related to the movement of the drugs further north into the United States typically results in higher pricing. The further away from the entry point along the southwest border, southern Florida, and California, there is

an increase in the value of the drugs as various facilitation costs are incurred by the organization for transportation, logistics, and storage.

12. Drug trafficking organizations often use couriers, sometimes referred to as mules, to transport drugs. Couriers are members of the organization who typically have little access to the overall organization, however, are entrusted with the transportation of large quantities of drugs across the United States. Organizations utilize couriers to further insulate themselves from law enforcement detection. A courier will utilize his or her own vehicle or rental vehicle which is not in any way connected to the organizational members who are directing the shipment of drugs. Although couriers take on a risk of detection from law enforcement, they are typically paid a large amount of money, relative to their time, if they complete the delivery of the drugs. Often these couriers are paid based on the quantity of drug they are transporting. For example, a distributor would pay a dollar amount per pound or kilogram of a substance being transported. To increase their chances of a successful delivery, couriers will employ various methods to conceal their actual travel itinerary. Couriers will pay additional persons to accompany them on the trip to appear more like individuals in a relationship and even utilize small children to assist in the illusion of a family trip. Couriers utilizing a companion also allows for a second individual to operate the load vehicle which in turn means the drugs arrive at the destination much faster and without prolonged stops. Couriers will sometimes wear specific uniforms such as military uniforms, in hopes of leniency and/or no detection when encountered by law enforcement. Once the couriers transport the drugs from their source areas within the United States to other locations within the United States, such as Kansas, the value and price of the drugs increase. In addition, larger metropolitan locations throughout the United States often act as "hubs" or transshipment points. These points are central locations which allow access to a particular region of the country for

the organization. Typically, the drug prices in these areas are often lower than the prices of the same drugs from the same organization at the farthest reaches of that region. Meaning, as the organization moves the drugs farther away from the "hub", the price of the drugs often rises as cost and risk to transport greater distances increases exponentially. A result of the greater risk involved in the traditional means of transportation, i.e. automobile, bus, train or plane, drug trafficking organizations have also employed the use of parcel carrier services such as U.S. Postal Service, United Parcel Service, and Federal Express. Utilizing these types of transportation services also allow a way for those involved in drug trafficking to avoid detection. The trafficker can utilize another individual to ship the illicit parcel. That individual can use fictitious names and addresses for the return address or sender which cannot be traced back to themselves by law enforcement. These parcels are typically paid for in cash (U.S. Currency). Cash payments allow no further means of identifying the individual who participated in the transaction since there is no account information available to further identify. In addition, many of the facilities which can be used by the individual shipping the parcel are not equipped with any surveillance equipment that can be accessed post seizure by law enforcement. In some cases, as another layer of disguise, the parcel could be going to a disinterested address or another individual who would not have any direct affiliation to the drug trafficking itself making it difficult for law enforcement to identify other members involved in the trafficking scheme. In terms of a post seizure investigation, communication of parcel tracking numbers can be passed through many layers of individuals via the use of encrypted communications through various cellular telephone applications which are not easily identifiable by law enforcement.

13. I am aware, after conducting drug investigations, debriefing confidential informants, and conducting interviews of defendants, that there is a reference within the drug business

related to individuals being referred to as "users" and "dealers". These terms are often used to describe whether the individual is engaged in drug trafficking (dealers) or a consumer (user). A "user" is also typically referred to as a "customer" since they will typically purchase narcotics for personal use or consumption. A "user" is not typically involved in the large-scale distribution of narcotics and typically has no direct connection to a large Source of Supply. Although the "user" can be involved in the retail distribution of small quantities of narcotics, typically it is in support of their habit. A "user" can not only purchase narcotics directly from a "dealer" but can utilize other forms of payment to include trading in property or performing various tasks for the "dealer" which can assist the dealer in avoiding detection from law enforcement of whatever criminal activity in which they may be involved. "Users" are not typically trusted with extremely large amounts of U.S. Currency or narcotics, however, there are exceptions. "Dealers" are often involved in the various facets of drug trafficking to facilitate their distribution activities. This may include a direct connection to a larger supplier of narcotics, the logistical mechanisms of the transportation of narcotics and narcotics proceeds, access to couriers and transporters, and the negotiations surrounding the price, quantity, and movement of illicit narcotics and/or drug proceeds. As it relates specifically to the quantities of narcotics in the possession of individuals, there is a distinct difference in a "user" quantity of a drug which is in the possession of an individual and a "distribution" quantity of a drug. An individual who is participating in the "use" of a narcotic, does not typically possess much more of the drug than what can be consumed over a short period of time. These quantities can vary to some degree based on that individual's volume of use, tolerance to a specific drug, access to a specific drug, and shear economics, meaning what that individual can afford to purchase at a given time. Large quantities of drugs, often measured in terms of ounces, pounds, and kilograms, are encountered by law

enforcement during the distribution process. These processes can be the manufacturing process, importation, transshipment or transportation, storage, wholesale distribution, and retail distribution. In addition, the weight or quantity of a drug is not always an indication of "distribution" as other factors may apply. Items present to include, drug packaging, measuring scales, cutting agents utilized to increase the quantity of a drug, ledgers, fabricated or natural implements to disguise the transportation of or to store quantities of drugs, and large quantities of drug precursors for a drug's manufacturing process can also be indictors. In addition, "dealers" who are engaged in "retail distribution" typically possess smaller quantities of a drug due to the need for quantities which are consistent with their customer base. I am familiar with retail drug distributors who sell methamphetamine and other illicit drug quantities by half gram, gram, "teener" (1.75 grams), and "eight ball" (3.5 gram) amounts. Retail distributors are not typically in possession of large amounts of drugs; however, they are still engaged in drug distribution to a customer base which is dependent on smaller quantities per transaction. Retail distribution does allow for a larger profit margin as often retail distributors can charge more for less quantities of a substance. A retail distributor can then conduct smaller quantity transactions and thus increase their overall profit margin. However, retail distribution often does increase the frequency of transactions and can bring an increased risk of detection by law enforcement.

14. I am familiar with the investigation of Mario GUERRERO Jr. and the circumstances surrounding his arrest, the seizure of approximately 4,500 grams of methamphetamine, approximately 602 grams of fentanyl pills, over approximately 7,600 grams of fentanyl in powder form, and the further investigative analysis of a cellular telephone utilized by GUERRERO.

15. On June 17, 2024, at approximately 11:55 p.m., Kiowa County Sheriff's Office (KWSO) Deputy Preston Capansky was positioned on U.S. 54 Highway near mile marker 102 when Deputy Capansky observed a vehicle, identified as a red Chevrolet Sonic bearing Texas registration TWS8487, traveling in the left (passing) lane east bound. That portion of the roadway is clearly marked "remain right except to pass" advising the driver to remain in the right lane of travel unless passing another vehicle. Deputy Capansky observed there were no other vehicles visible (either in front of or behind) in the area of the Chevrolet Sonic. Observing the traffic violation (8-1522(c)), Deputy Capansky entered U.S. 54 Highway east bound and initiated a traffic stop on the Sonic at mile marker 103. During the traffic stop, KWSO Deputy Matthew Woods stopped to assist Deputy Capansky. Deputy Capansky contacted the driver and sole occupant of the vehicle, later identified as Mario GUERRERO Jr., who advised that he (GUERRERO) spoke Spanish. Deputy Capansky advised GUERRERO that Deputy Capansky spoke some Spanish. Deputy Capansky communicated clearly in Spanish with GUERRERO requesting his driver license and insurance information. GUERRERO presented Deputy Capansky Texas Driver License 50127533 which identified GUERRERO as possessing a residential address in Houston, Texas. This information matched the vehicle registration information. Deputy Capansky noticed that there was a blanket laying over the backseat on top of some unknown items. It appeared to Deputy Capansky that the blanket was thrown into the back seat. During the traffic stop, GUERRERO spoke to Deputy Capansky while various law enforcement queries were being conducted. I reviewed the video footage of this interaction. I noted that GUERRERO advised that he was from Houston, Texas, but traveling from Albuquerque, New Mexico, destined for Wichita, Kansas. GUERRERO further indicated that he would be in Wichita, Kansas for two days before traveling to Oklahoma City, Oklahoma to visit a brother. Travel from Houston,

11

Texas to Wichita, Kansas would not ordinarily cause the traveler to encounter Albuquerque, New Mexico, under any normal route. Deputy Capansky asked GUERRERO for consent to his vehicle in both English and Spanish and on all occasions, GUERRERO granted consent to search the vehicle.

16. During the search of the vehicle, Deputy Capansky and Deputy Wood located a black trash bag in the backseat of the vehicle under a blanket. Within the bag, a total of 20 bundles or packages of illicit substances was located. One package of a clear crystallized substance was field tested at the traffic stop location and indicated a presumptive positive result for the presence of methamphetamine. GUERRERO was placed under arrest and transported to the Kiowa County (KS) Jail in Greensburg, Kansas, where a post Miranda interview was conducted by members of the KWSO with the assistance of an interpreter.

17. During the interview of GUERRERO, he advised that he was traveling from Los Angeles, California and stopped in Albuquerque, New Mexico, on the way to Wichita, Kansas. GUERRERO advised that he possessed two telephones which were seized by the KWSO. One telephone he advised was utilized to communicate and receive messages via WhatsApp. A DEA Administrative subpoena identified this telephone as having been activated on June 10, 2024, and had no subscriber information and appeared to be a pre-paid phone. GUERRERO's other phone was identified by DEA Administrative subpoena as active since February 18, 2023, and was subscribed to GUERRERO. GUERRERO indicated that he did not know what he picked up in California or the quantity. GUERRERO also stated that he was provided the addresses through WhatsApp and that he communications with an unknown acquaintance in Mexico who facilitates the contact with the people who provided the items in the bag. GUERRERO minimized his knowledge of the contents of the bag, however, GUERRERO ultimately advised that he knew there were drugs in the bag.

12

18. Pursuant to a lawful search warrant obtained by the KWSO in the State of Kansas for the telephones possessed by GUERRERO at the time of the seizure, I reviewed the data extracted from the telephone in which GUERRERO advised WhatsApp was utilized to communicate with co-conspirators relevant the seizure. During the initial review of the data, it was very apparent that the device was utilized by GUERRERO based on the various images of GUERRERO on the device, images of GUERRERO with other individuals, and images of identifying documents of GUERRERO being present. I noticed that the volume of WhatsApp messages (chats) was very minimal which is consistent with the short duration of time this device was activated prior to GUERRERO's arrest. I reviewed the device locations logged on the device and did corroborate that GUERRERO appeared to travel from Houston, Texas, to Los Angeles, California, and back to the site of the traffic stop in Greensburg, Kansas.

19. I reviewed a series of communications between GUERRERO and other individuals which are specific to the facilitation of GUERRERO traveling to California to receive the illicit narcotics and GUERRERO's transport of said narcotics to an intended destination in Wichita, Kansas. These messages involved unknown co-conspirator(s) in Mexico, California, and Kansas. The messages were in Spanish but were translated to English by a certified law enforcement officer for review.

20. GUERRERO was in contact with a WhatsApp user in Mexico assigned a Mexico based WhatsApp telephone number identifier. This unidentified individual is only known as the contact name "David". The totality of the messages indicate that this individual was acting as the facilitator for GUERRERO by providing the contact telephone number for the unidentified individual(s) whom GUERRERO would be meeting in Van Nuys (Los Angeles), California, and Wichita, Kansas, along with "bona fides" for the anticipated communication between GUERRERO and those individuals. "Bona fides" are usually

13

specific language which is passed to another individual which acts as a type of certification that "you" are the correct person making the communication or have the credibility of an organization member to participate in activity. In some cases, if an individual is referred to make a communication for the organization, they often say they are communicating "on behalf" of another individual. "David" provided the California WhatsApp number to GUERRERO and indicated the "on behalf of" or "bona fides" of "Tio" (Uncle). GUERRERO then communicated with the unidentified individual in California and advised that GUERRERO was picking up "Pescado" (fish) on behalf of "Tio" (Uncle). I know that "fish" or "scale" is one of many slang terms utilized to describe methamphetamine, specifically crystal methamphetamine. GUERRERO, while in route to California did inquire with "David" the quantity in which GUERRERO was going to receive in California. "David" told GUERRERO that there are "7.5", but "they" put "half of pills" plus "10 waters". I know that "waters" is another often utilized slang or coded term to reference crystal methamphetamine. "David's" reference to "pills" and "waters" is a reference to illicit narcotics in pill form (pills) and methamphetamine (water). "David's" reference to "10" correlates to the 10 bundles found to be marked "A-R" seized from GUERRERO. One of those specifically marked bundles tested presumptive positive for methamphetamine. "David's" reference to "half of pills" correlates to the 2 bundles of blue oval pills suspected to be fentanyl laced counterfeit Oxycodone M30 pills seized from GUERRERO. The remaining bundles seized were approximately 7 kilogram shaped and wrapped sized bundles and 1 approximately 1/2 kilogram shaped and wrapped bundle. The above reference message sent from "David" to GUERRERO accounts for all the 20 bundles of illicit narcotics seized from GUERRERO. In addition, this indicates that GUERRERO would have a direct

knowledge of what types of illicit narcotics and their quantities prior to him receiving them.

21. "David" advised GUERRERO that GUERRERO would be going to the "city", "wichola", "trusa", and "AR". These are references to geographic locations in which GUERRERO would be delivering the illicit narcotics. The words utilized by "David" indicate that these are terms which GUERRERO understands. It is common for large shipments of illicit narcotics to be transported via couriers to multiple locations. One way to differentiate the illicit narcotics packages from one another is to label or mark them distinctly either with symbols, specifically colored wrapping materials, or labels.  In this case, the geographic locations "city", "wichola", "trusa", and "AR", were specifically labeled on the various bundles of narcotics. Based on the totality of the investigation thus far, I believe "wichola" is Wichita, Kansas; "city" is Oklahoma City, Oklahoma; and "trusa" is Tulsa, Oklahoma. In addition, GUERRERO inquired with the unidentified California individual regarding the bundles and requested that the bundles were separated where each were due to be delivered by GUERRERO. The unidentified California individual assured GUERRERO that the bundles were marked where they were to be delivered.  GUERRERO and the unidentified California individual conversed to arrange the meeting and GUERRERO was provided a meeting location by the unidentified California individual. After the bundles were picked up by GUERRERO, GUERRERO contacted "David" via WhatsApp text message and WhatsApp audio message confirming that GUERRERO had received the narcotics. It is common practice for a courier to communicate throughout the transportation process. Drug trafficking organizations often require the courier to remain in communication or be readily available for the organization to monitor the movement of the illicit narcotics. The drugs are considered the commodity of value to the organization from a monetary standpoint as they represent

future profit (proceeds) upon delivery or have been already purchased prior to the shipment and would become a monetary loss if not delivered. With that in mind, not only are the drugs a representation of profit, but the courier is also of some value to the organization. The courier does possess specific information relevant to the organization and its movement of that commodity at that time. The courier has some direct knowledge of the individual(s) who are directing them. Although the scope of knowledge a courier possesses may vary based on the historical experience of the courier with a specific organization, there is a significant amount of trepidation members may experience due to not only a future law enforcement interaction, but the internal organizational threat of violence if a significant quantity of narcotics are lost for any reason.

22. "David" conversed with GUERRERO regarding his intended arrival time in Wichita, Kansas, which they refer to as the "W". I know that "W" or "the W" have been used by other traffickers as a reference to the City of Wichita, Kansas. GUERRERO asked "David" for the Wichita contact telephone number. "David" provided a WhatsApp telephone number with a Wichita, Kansas based identifier. "David" also provided the name or moniker "Chiguilin" as a bona fides. GUERRERO contacted the unidentified individual in Wichita, Kansas, known only as the contact name "Carlos". GUERRERO advised "Carlos" that he (GUERRERO) was bringing "fish" on behalf of "Chiguilin". "Carlos" provided the office address of an apartment complex in Wichita, Kansas, as the initial meeting location. The apartment complex is comprised of multiple individually assigned units and there was no indication by "Carlos" if this would be just an initial meeting location or if there would be further instructions. It is common for organizations to provide a general first meeting location to couriers or even purchasers of narcotics to give the recipient the ability to observe the arriving parties, determine if there is any law

16

enforcement presence, and provide a separate meeting location to attempt to identify any law enforcement presence or other sign of danger to the trafficker(s).

23. All substances seized by the KWSO were identified by the Kansas Bureau of Investigation (KBI) Laboratory during analysis. Two bundles containing blue oval pills were in fact counterfeit pills which contained fentanyl. Of the six-kilogram quantity bundles of white powder, all similarly wrapped, five were analyzed and found to contain fentanyl. Two-kilogram bundles of white powder, both similarly wrapped, were found to contain fentanyl. Ten one-pound quantity bundles containing a crystallized substance were found to contain methamphetamine.

24. I am familiar with the use of fake prescription pills being distributed by drug traffickers. These fake prescription pills are mass produced by criminal drug networks and falsely marketed as legitimate prescription pills. Drug traffickers (dealers) obtain these pills in large quantities which are often produced in Mexico in large clandestine laboratories and illicitly imported into the United States through the southwest border. These large quantities are distributed to various interior U.S. Sources of Supply associated to transnational criminal networks or cartels. These networks move these illicit drugs in the same manner as other types of drugs throughout the United States. These pills are also easily accessible being sold via social media and e-commerce platforms and often marketed to younger people. Although fake pills can be made to look like legitimate prescription opioids like hydrocodone (Vicodin) and alprazolam (Xanax) and stimulants like amphetamines (Adderall), they often contain fentanyl or methamphetamine. In this specific case, the blue oval pills displayed the markings of the prescription pill oxycodone 30mg, however, these pills contained the substance fentanyl. Fentanyl is a synthetic opioid which is most commonly found in fake pills and the primary driver in the increase of poisoning deaths in the U.S. DEA laboratory testing has found that 6 out

of every 10 pills with fentanyl contain a potentially lethal dose. These pills are commonly sold in dosage units or by the pill. In southwest Kansas, the retail cost of one fentanyl pill is approximately $15 to $20. This is in comparison to a retail cost in Wichita, Kansas, of approximately $5 to $10 per pill. In the southwest border region of the United States, purchases of bulk amounts of fentanyl pills, which would be amounts in the multiple 1,000, are approximately $.50 to $.80 per pill. Fentanyl in powder form is illicitly manufactured in the same manner, however, the powder is maintained in that form and not manufactured into pill form. Kilogram quantities of powder fentanyl cost approximately $30,000 per kilogram in the Kansas City, Kansas/Missouri area. In southwest Kansas, the retail cost of one ounce (28g) of methamphetamine is approximately $300 to $400. This is in comparison to a retail cost in Wichita, Kansas, of approximately $150 o $200 per ounce of methamphetamine. A retail pound quantity of methamphetamine is approximately $1,800 per pound. Wichita, Kansas, is a populous transshipment point (hub) for illicit drugs. I know it is common for drug traffickers to obtain illicit drugs in larger quantities in geographic locations which afford a lower price for the drugs. This allows the distributor to then take that quantity of drugs, which were obtained at a significantly cheaper price, and resell (distribute) those illicit drugs at a higher price and thus increase the overall profit margin.

25. GUERRERO was in possession of multiple types of illicit drugs in bulk form intended for further distribution. I know this to be commonly referred to as "poly-drug" distribution. A poly-drug distribution organization is a drug trafficking organization who engages in the distribution of more than one principal drug. A poly-drug distributor can distribute to a larger segment of purchasers who may request one individual type or both types of illicit narcotics. In this case, the presence of methamphetamine, fentanyl pills

and fentanyl powder destined for various geographic locations is indicative of poly-drug distribution.

26. Based on my knowledge and participation in the investigation of Mario GUERRERO Jr., I conclude that the defendant was engaged in drug trafficking, specifically possession with intent to distribute a controlled substance in violation of 21 U.S.C. 841 (a)(1) and (b)(1)(A).

# Previous Expert Testimony

- ▪ *June, 2016 - Case No. 6:15-CR-10009-EFM, United States v. Filiberto Escobedo-Colon, Prosecutor David Lind.* Provided testimony on how drug dealers used the telephone to make arrangements for the distribution of drugs from Colorado to Kansas; how drugs are trafficked between states; how the value and price of the drugs changes depending on the area of the country and how it was determined that the amount of drugs involved in this case were intended for further distribution.

**Erik N. Brown**
**Special Agent**
**U.S. Drug Enforcement Administration**
**Garden City Post of Duty**

### _Education_

- 2000 Graduate, Texas Wesleyan University, BA Finance/Economics – Ft. Worth, TX
- 2002 Graduate, Arlington Police Department Academy Class 24– Arlington, TX
- 2009 Graduate, DEA Agent Academy, Justice Training Center BA 180 – Quantico, VA

### _Career/Assignments_

- 2002 to 2005 – Arlington Police Department, Arlington, TX
  - Patrol Division
- 2005 to 2008 – Arlington Police Department, Arlington, TX
  - HEAT Unit – Street Crimes Unit
- 2008 to Present – U. S. Drug Enforcement Administration
  - Ft. Worth Resident Office, February 2009 to March 2009
  - Garden City (KS) Resident Office, March 2009 to December 2016
  - Ft. Worth District Office, December 2016 to October 2019
  - Garden City (KS) Post of Duty (POD), October 2019 to Present

- ❖ 06/2013 to 09/2016 - Member of the Garden City PD/Finney County Sheriff's Office SWAT Team
- ❖ 05/2022 – Member of the DEA Kansas City Special Response Team

### _Technical Training_

#### Formal Training Academies

- Arlington Police Department Training Academy (Texas) - 27 weeks of Law Enforcement Training (Texas Commission on Law Enforcement Officer Standards and Education accredited) – Arlington, TX
- DOJ – Drug Enforcement Administration – Basic Agent Training Class 180;  20 weeks of Federal Law Enforcement Training - Quantico, VA

#### Narcotics/Investigative Training

- Calibre Press Street Survival Seminar – 16 Hour 01/2004
- NCTCG Drug Interdiction 03/2004
- Reid and Associates Street Crime Course (Arlington Police Department) 02/2005

- North Texas HIDTA Organized Crime, Terrorism & Theft of Intellectual Property  02/2006
- North Texas HIDTA Marihuana Grow Operations 08/2007
- DEA/EPIC Highway Interdiction 08/28 -08/31/2007
- MCTFT Domestic Drug Interdiction 10/17-10/19/2007
- MCTC Advanced Vehicle Contraband Concealment 03/17-03/18/2007
- MCTFT Criminal Street Gang Investigations 04/21-04/22/2008
- North Texas HIDTA ID Theft and the Drug Connection 08/18/2008
- Kansas Narcotics Officers Association Conference – Topeka, KS 03/15/2010 through 03/18/2010 – 24 hours of Narcotics Training Received
- Kansas Narcotics Officers Association Conference – Wichita, KS 03/14/2011 through 03/17/2011 – 20 hours of Narcotics Training Received
- Clan Lab Technician Certification – BTC 87, Level B 40 hour - 06/2022
- ESF-13/Disaster Response Course - DRC #8, 40+ hour - 05/2023

**Firearms/Tactical Training and Instructor Certifications**

- NCTCG Bombs and Explosives Recognition 02/2005
- Tactical Response Fighting Rifle – 16 Hour - 02/2006
- Taser Certification 12/2006
- 40 Hour Patrol Carbine (AR-15) School/Certification APD
- 80 Hour Basic SWAT School (Arlington Police Department) 04/2007
- Technical Services Group – Surefire Low Light Training 10/13/2010
- Prevention and Response to Suicide Bomber Incidents (PRSBI), Department of Homeland Security (DHS) and New Mexico Tech (Playas, NM), 11/03/14 to 11/07/14
- MCTC Tactical Medicine for High Risk Teams 09/12/16 to 09/14/16
- 80 Hour DEA Special Response Team Certification Course (**SCC-05**) 03/27/17 to 04/07/17 Ft. AP Hill (Army Base) Virginia
- DEA Tactical Raids **Instructor** Certification (06/2011) (80 hrs) (Recertification 08/2015, 06/2019)
- DEA Defensive Tactics **Instructor** Certification (05/2018) (80 hrs) (Recertification 06/2019)
- ASP Tactical Baton **Instructor** (ASP-48862)
- Asymmetric Solutions 5 Day SWAT Course (09/18 to 09/22/23) with DEA KC SRT

**Other Law Enforcement Training and Deployments**

- Basic Police Mountain Bike School - 40 Hour 09/2006
- DEA Field Training Agent Certification (No. 71) 02/2013
- DEA Quick Response Team (QRT) Deployment – ESF13 – Hurricane IRMA 09/2017

***Professional Accomplishments***

- Arlington Police Department (APD) Employee of the Month 12/2003, 04/2005
- APD Life Saving Award 08/2004
- APD Peak Performer Award 12/2003, 03/2004, 08/2004, 04/2005
- Numerous Letters of Commendation received from the Arlington Police Department
- DEA Pistol Expert Award 02/2009
- Acting Resident Agent in Charge for DEA Garden City Resident Office
- Resident Agent in Charge for DEA Garden City Resident Office
- Acting Group Supervisor, Enforcement Group 1, Fort Worth District Office
- Letter of Commendation from US Attorney's Office, Topeka, KS, reference *Operation White Pistol*
- Expert Witness for DEA in the District of Kansas
- DEA Exceptional Performance Award 2009-10, 2011-12, 2012-13, 2013-2014, 2014-2015
- DEA On the Spot Award



# Kansas Bureau of Investigation
## Forensic Laboratory Report
### Chemistry Section

| | | |
|---|---|---|
| Attn: | PRESTON CAPANSKY | |
| To: | KIOWA COUNTY SHERIFF'S OFFICE | |
| | GREENSBURG, KS 67054-2339 | |

DATE            August 01, 2024
LAB CASE#   G24-01552
REPORT#     1
Contributing Agency Case #
    24-98

## EVIDENCE DESCRIPTION

Submission # 1 - received on 06/20/2024 from PRESTON CAPANSKY

| Lab Item # | Contributor Item # | Description |
|---|---|---|
| 1 | 1 | 6 bundles (analyzed 5 with white powder). |
| 2 | 2 | 2 bundles of white powder. |
| 3 | 3 | 10 bundles of crystals. |
| 4 | 4 | 2 bags of blue round tablets (analyzed 1 tablet from each bag). |

## RESULTS AND CONCLUSIONS

Examination Start Date:           07/30/2024
Examination Completion Date:   08/01/2024

Fentanyl was detected in the 5 bundles analyzed in Lab Item 1 (total gross weight of 5 bundles - 5398.63 grams ± 0.60 gram).

Fentanyl was detected in both bundles in Lab Item 2 (total gross weight of both bundles - 2241.79 grams ± 0.24 gram).

Methamphetamine was detected in all 10 bundles in Lab Item 3 (total net weight of 10 bundles - 4491.73 grams ± 1.20 grams). Items 3.1-3.4 were combined for purity testing: net weight - 1781.04 grams; purity - 100.0% ± 8.2% methamphetamine calculated as the hydrochloride salt.

Fentanyl was detected in both tablets analyzed in Lab Item 4 (total net weight of all tablets - 602.93 grams ± 0.24 gram).

## CERTIFICATE OF ANALYSIS (PURSUANT to K.S.A. 22-3437 and K.S.A. 53-601)

The methodologies used for this analysis, along with the Lab Items they were used with include:



NOTE 1: All ± values listed in the body of this report are at a coverage probability of approximately 95%.
NOTE 2: Unless otherwise specified in the body of this laboratory report, individual weights reported in grams are ± 0.02 gram for weights less
than or equal to 30 grams and ± 0.12 gram for weights greater than 30 grams. Weights reported in kilograms are ± 0.03 kilogram.

RD1_GUERRERO_000049

G24-01552
Report #1
Page 2 of 2

Gas Chromatography/Mass Spectrometry - Lab Items 1, 2, 3 and 4
Spot Testing - Lab Items 1, 2, and 3
Ultraviolet/Visible Spectrophotometry - Lab Items 3.1-3.4 combined
Weight Determination - Lab Items 1, 2, 3 and 4

These methodologies are generally recognized in Forensic Chemistry as reliable for the
identification of the substances listed in this Forensic Laboratory Report, and have been accepted
by Kansas courts in previous cases. All equipment used was functioning within approved
parameters, the evidence was properly sealed at the initiation of the examination, and all
procedures were performed in accordance with all pertinent quality assurance protocols of the
KBI Forensic Science Laboratory, which has been accredited in the field of Forensic Testing by
ANAB to ISO/IEC 17025:2017 International Standard and ANAB Accreditation Requirements
for Forensic Testing and Calibration since 06/13/2019.

I, Cynthia L. Wood (BS), have been employed by the Kansas Bureau of Investigation for over 25
years, have completed the appropriate training protocols and proficiency tests, and have
previously analyzed over 10,000 samples for the presence of controlled substances. I hereby
attest that I am the Forensic Scientist who analyzed the results of the methodologies applied in
this analysis and have concluded that those results support the RESULTS AND CONCLUSIONS
in this Laboratory Report.

I certify under penalty of perjury that the foregoing is true and correct. Executed on August 07,
2024.


Cynthia L. Wood
Forensic Scientist



# Kansas Bureau of Investigation
## Forensic Laboratory

On July 1, 2002, the Kansas Legislature amended K.S.A. 28-176, requiring the KBI Laboratory to collect a $400 fee from defendants convicted in cases in which the KBI performed an analysis. The purpose of the law is to require defendants to pay for the cost of the examination. This fee is in addition to any other court costs or fees assessed in the case.

The fees collected are used for providing laboratory services, purchase and maintenance of equipment, education, training and scientific development of lab personnel and for use in the destruction of seized property and chemicals.

The KBI appreciates your assistance in notifying prosecutors that this fee shall be included in any plea agreement or upon conviction. Enclosed is a suggested sample order of court costs for laboratory fees which can be utilized to formulate the court order.

## THE ATTACHED ORDER OF COURT COSTS FOR LABORATORY FEES MUST BE FORWARDED TO THE PROSECUTING COUNTY/DISTRICT ATTORNEY

RD1_GUERRERO_000051

IN THE DISTRICT COURT OF Kiowa COUNTY, KANSAS

STATE OF KANSAS

        vs                                        Case No. _____

Mario Guerrero Jr.

## ORDER OF COURT COSTS FOR LABORATORY FEES
Pursuant to K.S.A. 28-176

    This matter comes before the court for consideration of a motion by the State of Kansas, through the undersigned attorney, for an order of court costs in the amount of $400.00 per offense for forensic science or laboratory services or forensic computer examination services provided in connection with the investigation in this case. K.S.A. 28-176 provides that any person convicted or diverted, or adjudicated or diverted under a preadjudication program pursuant to K.S.A. 22-2906 et seq., 38-2346 et seq., or 12-4414, and amendments thereto, of a misdemeanor or felony contained in chapters 21, 41, or 65 of the Kansas Statutes Annotated, or a violation of K.S.A. 8-2,144 or 8-1567, shall pay a separate court cost of $400.00 to the Kansas Bureau of Investigation for each offense in which forensic science or laboratory services, forensic computer examination services or forensic audio and video examination services were provided in connection with the investigation.

    THEREUPON after making due inquiry, the court finds that the defendant is required to pay the laboratory analysis fee, pursuant to K.S.A. 28-176. The court finds the defendant was convicted, adjudicated or diverted of_____ offenses in which exams were conducted, at a fee of $400.00 for each offense, for a total amount of $_____. This fee shall be paid by the defendant to the clerk of the district court, and credited to the Kansas Bureau of Investigation Laboratory Analysis Fee Fund.

    IT IS SO ORDERED.


                                   _____
                                   Judge of the District Court
Prepared and submitted:


_____
Attorney for State

Laboratory Case Number:   G24-01552

Please refer to this number and defendant name when submitting payment to the KBI.

# STATEMENT OF QUALIFICATIONS

**PERSONAL INFORMATION:**

**Name:** Cynthia L. Wood, F-ABC          **Job Title:** Forensic Scientist III

**Name of Lab:** Kansas Bureau of Investigation

**Location: 625 Washington**
Great Bend, Kansas 67530          **Date:** 2/9/2023
620, 603-7112

**DISCIPLINE(S):**

Controlled Substances

**Sub-disciplines:**

None

**EDUCATION:**

| Institution | Start Date | End Date | Major | Degree Completed |
|---|---|---|---|---|
| Fort Hays State University | 08/1982 | 05/1985 | Chemistry | Bachelor |

**OTHER TRAINING:**

| Other Training Type | Training Description | Date | Hours |
|---|---|---|---|
| Formal Training Received | DEA Drug Analysis | 1986 | 40 |
| Workshop | MAFS GC/MS | 1987 | 24 |
| Formal Training Received | FBI Arson Analysis | 1988 | 40 |
| Workshop | MAFS Drug Analysis | 1988 | 16 |
| Formal Training Received | FBI Chromatography School | 1989 | 80 |
| Workshop | MAFS Drug Analysis | 1989 | 16 |
| Workshop | MAFS Drug Analysis | 1990 | 16 |

| | | | |
|---|---|---|---|
| Workshop | MAFS Steroid Analysis | 1991 | 8 |
| Workshop | CAC Steroid Workshop/Conference | 2008 | 32 |
| Workshop | CLIC Natural Products Workshop/Conference | 2008 | 24 |
| Workshop | CLIC Basic Meth Synthesis Workshop/Conference | 2009 | 36 |
| Workshop | MAFS Chemistry of Clan Labs workshop/conference | 2010 | 24 |
| Workshop | SWAFS Synthetic Cannabinoids | 2010 | 8 |
| Formal Training Received | SWAFS Conference general session | 2012 | 4 |
| Workshop | SWAFS Designer Drug Derivatization | 2012 | 4 |
| Workshop | SWAFS Drug Sampling using Bayesian Approach | 2012 | 4 |
| Workshop | SWAFS K9 Demo and Body Farm Exposed | 2012 | 4 |
| Workshop | SWAFS Molecular Microscopy | 2012 | 4 |
| Workshop | SWAFS Thriving in the Courtroom | 2012 | 8 |
| Workshop | CLIC Pharmacology Workshop/Conference | 2013 | 40 |
| Formal Training Received | MAFS Annual Meeting | 2014 | 16 |
| Workshop | Current Issues in Crime Scene Investigation | 2014 | 4 |
| Workshop | Current Issues in Drug Chemistry | 2014 | 8 |
| Workshop | GC Troubleshooting | 2014 | 4 |
| Workshop | Statistics for Forensic Scientists | 2014 | 4 |
| Workshop | Validation Studies for Analytical Techniques | 2014 | 4 |
| Formal Training Received | KDIAI Manhattan | 2015 | 12 |
| Workshop | SWAFS Intro to Explosives | 2015 | 4 |
| Workshop | SWAFS Marijuana Edibles | 2015 | 4 |
| Workshop | SWAFS OKC Bombing | 2015 | 4 |
| Workshop | SWAFS Drugs | 2015 | 8 |
| Workshop | SWAFS The Moiety Exchange | 2015 | 4 |
| Formal Training Received | Chemistry refresher course | 2016 | 12 |
| Formal Training Received | KDIAI Wichita | 2016 | 12 |
| Workshop | SAFS Interpreting Lab Reports | 2016 | 4 |
| Workshop | SAFS Applications of GC/FTIR | 2016 | 4 |

| Workshop | SAFS Drug Chemistry Topics | 2016 | 8 |
|---|---|---|---|
| Workshop | SAFS Fieldable Mass Spec | 2016 | 4 |
| Workshop | SAFS Progressive System of Drug ID | 2016 | 4 |
| Workshop | Expert Testimony | 2018 | 16 |
| Workshop/Conference | CLIC Workshop and Conference | 2018 | 30 |
| Workshop/Conference | CLIC Tableting Workshop and Technical Training Seminar | 2019 | 32 |
| Virtual Symposium | SWAFS Virtual Symposium | 2020 | 22 |
| Virtual Symposium | CFSRE Current Trends in Seized Drug Analysis | 2021 | 12 |
| Virtual Symposium | CFSRE Lessons Learned from Seized Drug Errors in Wrongful Convictions | 2022 | 4 |
| Virtual Symposium | CFSRE Current Trends in Seized Drug Analysis | 2023 | 15 |

## COURTROOM EXPERIENCE:

| Discipline | Number of Times |
|---|---|
| Controlled Substances | 350 |

## PROFESSIONAL AFFILIATIONS:

| Start Date | End Date | Organization/Position Held |
|---|---|---|
| 1987 | current | Midwestern Association of Forensic Scientists |
| 2008 | current | American Board of Criminalistics |
| 2014 | current | Kansas Division of the International Association for Identification |

## EMPLOYMENT HISTORY:

| Job Title | Employer | Principal Duties | Tenure |
|---|---|---|---|
| Forensic Scientist | Kansas Bureau of Investigation | Controlled Substance Analysis | 26 years |

## CERTIFICATIONS:

Fellow of the American Board of Criminalistics, June 2008



# KBI - Federal Prosecution Testimony Report
## Testimony Provided Within Last 48 Months

9/23/2024

**Analyst: Cynthia L. Wood**

| Court Dates | Plaintiff vs. Defendant(s) | Court Case # | County |
|---|---|---|---|
| 09/23/2021 - 09/24/2021 | State of Kansas vs. Nicole Francis Wolf | 2021-CR-000286 | Saline |
| 12/07/2021 - 12/09/2021 | State of Kansas vs. Carlo Hibbard | 20cr017 | Trego |
| 01/27/2022 - 01/28/2022 | State of Kansas vs. Deandre Kavaughn Martin | 2020-CR-62 | Wabaunsee |
| 12/13/2022 - 12/14/2022 | State of Kansas vs. PAUL VASQUEZ | 21CR82 | Rice |
| 06/27/2023 - 06/27/2023 | State of Kansas vs. Mark James Goracke | 2022-CR-000510 | Saline |
| 12/19/2023 - 12/19/2023 | State of Kansas vs. Chad A. Allen | 2020-CR-000228 | Reno |
| 02/13/2024 - 02/13/2024 | State of Kansas vs. BRITTANY NICHOLE PRINCE | 2023-CR-000008 | Harper |

Number of Case: **7**