IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

*Plaintiff*,

v.

MARIO GUERRERO, JR.,

*Defendant*.

Case No. 24-CR-10096-EFM

**MEMORANDUM AND ORDER**

Before the Court is Defendant Mario Guerrero, Jr.'s Motion to Suppress Evidence (Doc. 26). Defendant argues that the traffic stop, although initially valid for a lane violation, became unconstitutional when Deputy Capansky extended the encounter by asking about contraband and requesting consent to search Defendant's vehicle without reasonable suspicion. Defendant also contends that his consent was not voluntary due to coercive circumstances, including the deputy's retention of his driver's license. Conversely, the Government maintains that the stop and search were reasonable, asserting that the questions did not prolong the stop and Defendant's consent was voluntary. Additionally, the Government argues that even if an unlawful detention had occurred, the evidence would have inevitably been discovered during a lawful inventory search following Defendant's arrest on an outstanding warrant. For the reasons stated below, the Court denies Defendant's Motion to Suppress.

## I.     Factual and Procedural Background

On June 17, 2024, while sitting stationary on U.S. Highway 54 near mile marker 102, Kiowa County Sheriff's Office (KCSO) Deputy Preston Capansky observed a red Chevrolet Sonic vehicle ("Chevy") with a Texas registration tag traveling in the left east-bound lane with no other vehicles in front or behind the Chevy. Because the highway was marked "remain right except to pass," Capansky perceived that Defendant was violating K.S.A. 8-1522(c), which prohibits a vehicle from lingering in a passing lane on a highway. Upon observing the violation, Capansky initiated a stop of the Chevy by activating his marked patrol vehicle's lights. The Chevy stopped on the side of the highway near mile marker 103. KCSO Deputy Matthew Woods arrived on the scene to assist Capansky with the stop. Capansky's body camera captured his interactions with the driver of the Chevy, who was Defendant.

After the Chevy stopped, Capansky approached the driver's side and encountered Defendant. Capansky tried to advise Defendant of the reason for the stop, but Defendant stopped Capansky to ask if he spoke Spanish. Capansky responded, "Poquito" (a little), but he continued in English, "You have to move to the right," in reference to the violation. In Spanish, Capansky asked Defendant for his license and insurance, both of which Defendant produced. Capansky returned to his patrol vehicle with Defendant's license, opened his laptop computer, put the license on the computer, and made various inquiries with a program on the computer called "Enterpol." While Capansky was typing on the laptop computer, Woods escorted Defendant to Capansky's patrol vehicle and seated Defendant in the front passenger seat. Capansky asked Defendant several questions as he continued to type on his laptop, including whether his license was valid ("Licencia bueno?"), where he was going ("Adónde vas?"), and where he was coming from ("Dónde vienes?"). Defendant indicated in English that his license was good and said he was coming from

Houston and going to Wichita. In English, Capansky asked Defendant, "How long? How long in Wichita are you going to be? Days? Weeks?" Defendant replied in English, "I go to Albuquerque yesterday, and Albuquerque to here eight hours." Then he stated that he was going to be in Wichita for "two days." When Capansky asked him "what for?" in English, Defendant replied in English that he had friends, that he would be in Wichita for two days, and then he would go to see his brother in Oklahoma. Capansky continued typing on his laptop computer while questioning Defendant.

Gesturing towards the Chevy, Capansky then asked Defendant whether he had anything illegal in his vehicle ("Nada ilegal?"). Defendant replied, "No." Capansky asked if he was transporting firearms ("No armas?"). Defendant replied, "No." Capansky asked if he was transporting drugs ("Drogas?"). Defendant did not respond. Capansky asked if he was carrying more than $10,000 ("Dinero ten thousand?"). Defendant replied, "No."

Capansky then asked Defendant if he could search the Chevy ("Puedo buscar el vehículo?"), and Defendant replied, "Okay." During this exchange, Capansky was interspersing his questions to Defendant with typing data into his computer.

After Defendant consented to the search, Capansky called in Defendant's license to dispatch to check if it was valid. Capansky again asked Defendant if he could search the Chevy, and Defendant again replied that he could.

Capansky and Defendant then exited the patrol vehicle, at which point Capansky told Woods, "We can search." Now on the side of the highway with Defendant, Capansky asked Defendant, "We're just gonna search, that okay still?" Defendant nodded affirmatively and said, "Yeah."

Capansky and Woods then approached the Chevy and started searching it, beginning in the front seat. At this point, dispatch told Capansky that Defendant had an outstanding non-extraditable warrant for a drug-related charge. According to Capansky's report of this incident, dispatch advised that Defendant "had a possible warrant out of Tennessee for failure to appear, initial charge was drug related."

Capansky continued his search and looked in the back seat of the Chevy, where he located a black plastic bag. He felt the plastic bag, noting "those are bricks of something." Upon further inspection, he uncovered the bricks and suspected they were bundles of drugs. Based on this belief, he detained Defendant. In all, Capansky found ten plastic-wrapped bundles containing about ten pounds of methamphetamine, six plastic-wrapped bundles containing about one pound of fentanyl, two packages containing blue pills, and cocaine. On the roadside, the deputies read Defendant his Miranda rights in English, and Defendant indicated that he understood.

On September 5, 2024, Defendant was indicted on two counts of drug possession with intent to distribute. On February 1, 2025, Defendant filed this Motion to Suppress. The Government timely responded, but Defendant did not reply. On May 14, 2025, the Court held a hearing during which the parties narrowed their arguments. At the conclusion of the hearing, Defendant asked the Court for leave to file supplemental briefing. The Court agreed and asked both parties to submit any additional briefings by May 28, 2025. The matters, now fully briefed and submitted, are ripe for the Court's ruling.

## II. Legal Standard

The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."[1]

---

[1] U.S. Const. amend. IV.

Under the exclusionary rule, "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure."[2] If a search or seizure violates the Fourth Amendment, the "fruit of the poisonous tree" doctrine prohibits the admission of any subsequently obtained evidence, including information, objects, or statements.[3] Searches must be authorized by a warrant unless an exception to the warrant requirement applies.[4] The government bears the burden to prove that a warrantless search or seizure was justified.[5]

### III.     Analysis

During the hearing, the Court's factual findings narrowed the arguments originally made by the parties in their briefings. First, Deputy Capansky testified that he generally does not make arrests on non-extraditable warrants, and in this case, he would not have arrested Defendant based on the outstanding warrant alone. Thus, the Court found that this testimony foreclosed the Government's inevitable discovery theory. Second, Deputy Capansky testified that he asked Defendant about the contents of the Chevy and began the search before he received the return from dispatch—without which a traffic stop is incomplete. Consequently, since the permissible inquiries relevant to the traffic stop had not been completed, and since the traffic stop was not otherwise impermissibly extended, the Court found that this testimony foreclosed Defendant's argument that the deputies' questions and subsequent search unreasonably prolonged the traffic stop.

After making the above findings, the only issue left before this Court is whether the consent exception applies to the deputies' warrantless search of Defendant's vehicle. The Government

---

[2] *United States v. Calandra*, 414 U.S. 338, 347 (1974).

[3] *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963).

[4] *California v. Carney*, 471 U.S. 386, 390 (1985).

[5] *United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th Cir. 2001) (citations omitted).

argues that Defendant's consent was knowing, intelligent, and voluntary. However, Defendant contends that his consent was based on coercion or duress.

"A person may voluntarily consent to a search even while being legally detained."[6] "If the government seeks to validate a search based on consent, the government bears the burden of proving that the consent was freely and voluntarily given."[7] The Tenth Circuit has established a two-part test for determining the validity of consent: (1) the government must proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given; and (2) the government must prove that this consent was voluntarily given without implied or express duress or coercion.[8]

"[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."[9] The Tenth Circuit has identified the following non-exhaustive relevant considerations for courts to use when assessing the voluntariness of consent:

> physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical, and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons. Whether an officer reads a defendant his Miranda rights, obtains consent pursuant to a claim of unlawful authority, or informs a defendant of his or her right to refuse consent also are factors to consider in determining whether consent given was voluntary under the totality of the circumstances.[10]

More recently, the Tenth Circuit has also considered as relevant factors the location of the encounter, whether the officers are uniformed or in plain clothes, and whether and for how long

---

[6] *United States v. Contreras*, 506 F.3d 1031, 1037 (10th Cir. 2007).

[7] *United States v. McRae*, 81 F.3d 1528, 1536 (10th Cir. 1996); *see also United States v. Mendenhall*, 446 U.S. 544, 557 (1980).

[8] *McRae*, 81 F.3d at 1537; *see also United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007).

[9] *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).

[10] *United States v. Jones*, 701 F.3d 1300, 1318 (10th Cir. 2012) (further citations omitted).

the officers retain the defendant's personal effects such as tickets or identification.[11] Courts must weigh all these factors equally without giving any single factor extra weight over another.[12]

Here, Defendant claims that the prolonged retention of his license and the presence of two deputies coerced him into complying with their request to search the Chevy. In contrast, the Government contends that the deputies maintained a gentle tone, made no threats, never brandished any weapons, and did not physically mistreat Defendant. The deputies asked Defendant three times if they could search the Chevy, both in Spanish and in English, and each time Defendant affirmatively consented.

The Government produced Deputy Capansky's body camera footage and the dash camera footage from his patrol vehicle to support its arguments. In addition, Deputy Capansky testified at the hearing. From the evidence, it seems apparent that Defendant's consent was unequivocal and freely and intelligently given. Although there were two deputies in two separate police vehicles and only one driver, this factor does not necessarily weigh in Defendant's favor. Deputy Capansky testified that it is common for two officers to work together for safety reasons. Although two officers usually ride together in the same vehicle, sometimes solo officers call another to the scene, especially when the confrontation occurs at night.

Throughout the encounter, both officers were polite and accommodating. They did not threaten, deceive, or trick Defendant. They asked him basic questions such as his coming and goings, the validity of his driver's license, and whether his vehicle contained anything illegal. They asked him three times for his consent—twice when Defendant was sitting in the patrol car with Deputy Capansky and once after exiting the patrol car on the roadside just before the deputies

---

[11] *United States v. Gomez-Arzate*, 981 F.3d 832, 842 (10th Cir. 2020).

[12] *See United States v. Drayton*, 536 U.S. 194, 207 (2002).

began the search. Deputy Capansky asked Defendant in both Spanish and English whether he could search the vehicle and Defendant responded either "okay" or "yes" each time.

Additionally, Defendant argues that the officers never informed him that he was free to leave or that he could refuse consent. Although neither deputy advised Defendant that he could refuse their request to search the Chevy, the Supreme Court has explicitly rejected a *per se* requirement that law enforcement agents must always inform citizens of their right to refuse when seeking permission to conduct a consent search.[13] "While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent."[14] "Instead, the Court has repeated that the totality of the circumstances must control, without giving extra weight to the absence of this type of warning."[15] Thus, although this factor weighs in favor of Defendant, it alone is insufficient to invalidate Defendant's consent.

Furthermore, both parties agree that Defendant consented to the search before he was free to leave. It is unclear exactly when Deputy Capansky returned Defendant's license to him. However, the deputies did not receive the return from dispatch until after the search had begun. Thus, regardless of when the license was returned, Defendant was clearly not free to leave until dispatch's response was received. "Although the fact that one is detained during an investigation no doubt implies an atmosphere not altogether consensual . . . the fact of an investigative detention, standing alone, is not so coercive as to render the consent of all detained persons involuntary."[16] Even Defendant acknowledges that the Tenth Circuit's "bright-line rule" requiring the driver's

---

[13] *Id.* at 206.

[14] *Id.* (further citations and quotations omitted).

[15] *Id.*

[16] *United States v. Olivares-Campos*, 276 F. App'x 816, 824 (10th Cir. 2008).

documents to be returned before the stop may be considered a consensual encounter, is only applicable *after* completion of the traffic stop. This makes sense; it would be unreasonable to require officers to return the driver's license to him or issue him a ticket before completion of the traffic stop. This is, of course, because he is not free to leave until the stop is completed. As such, the deputies' retention of Defendant's license in this case does not support coercion or duress.

Lastly, Defendant argues that it would have been better practice for the deputies to wait until the conclusion of the traffic investigation before asking for consent, or to form some reasonable articulable suspicion before performing the search. However, the Supreme Court has repeatedly affirmed that "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'"[17] The Court explains that "[t]o be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials."[18] Here, the Court is not convinced that Deputy Capansky made any legal mistake, but even if he did, it was reasonable for him to ask for and act on Defendant's consent before receiving the return from dispatch.

In sum, the totality of the circumstances does not support a finding of coercion or duress. Although the presence of two officers and the failure to inform Defendant of his right to refuse consent may weigh against voluntariness, the deputies' polite demeanor, absence of threats or deception, and Defendant's repeated affirmations to the deputies' requests weigh in favor of finding that Defendant's consent was knowing, intelligent, and voluntary. As such, Defendant's Motion to Suppress is denied.

---

[17] *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (quoting *Riley v. California*, 573 U.S. 373, 381 (2014)).
[18] *Id.* at 60–61.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress Evidence (Doc. 26) is **DENIED**.

**IT IS SO ORDERED.**

Dated this 30th day of May, 2025.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE